### Jesse Killingsworth v. The State.

Where the facts proved are sufficient to sustain the verdict, the law of the case has been correctly laid down, and the court below has refused a new trial, this court will not interfere with the judgment, because of the existence of some discrepancies in the testimony, which it was the province of the jury to reconcile by their verdict; especially, where these discrepancies are not greater than are generally to be found in the history of all such cases, and there is nothing in the record to leave a doubt of the defendant's guilt.

See this case, wherein the defendant was convicted of murder in the second degree, and sentenced to confinement in the penitentiary for twenty years, for a state of facts in which it was held that the jury exercised a sound judgment in fixing the measure of the punishment, which was deemed by this court not to be excessive.

Appeal from Harris. Tried below before the Hon. Peter W. Gray. The appellant was indicted for the murder of Jack McQuillan.

The difficulty between the parties, which resulted in the death of McQuillan, occurred in a drinking house, and originated in an idle conversation, as to whether Killingsworth would "treat." The deceased ordered the defendant out of the house, (a public house, with which neither had any connexion,) and on his re-- fusing to go, the deceased shoved him out; the defendant came back, and then started off, saying that he would get an officer and have the deceased put in jail. He met with the city marshal, whom he requested "to arrest a man who had misused him." The marshal told him to get a writ, and he would do so. This was in the morning.

The defendant returned some time afterwards to the grocery; in the meanwhile, the deceased had become quite drunk, and was lying down asleep. The defendant came into the back room of the establishment, and inquired of the proprietor, if the deceased was still there; and was informed that he was. He said "that he would have satisfaction for deceased's ill-using him." Nelson, the proprietor, expostulated with him, and told him not to make any fuss in his house; the defendant said, "Well, I won't." At

this time, the deceased, hearing the defendant's voice, got up from where he had been lying, in the front room, and ordered defendant out, saying that he would put him out.   The defendant said he would not go out; he was in the center of the room, and, as stated by one of the witnesses, appeared very stubborn, and seemed quite satisfied and independent.   The deceased obliged him to go out.   One witness stated that he kicked the defendant; another, that he made motions with his foot, as if to kick him, and might have done so, but the witness did not see it; the defendant backed to the door, when the deceased pushed him out.

The deceased being very drunk, fell down, when he pushed the defendant out; he was, in the language of one of the witnesses, (Quinn,) who was on the spot, "dead drunk, and completely helpless."   While the deceased was down, the defendant gave him four blows under the arm.   The deceased was badly cut with a knife.   The witness stated that he saw all that passed out of doors, where the stabbing occurred.   A knife produced on the trial was identified by a witness, Wiseburt, as the same which was left with him by the defendant for repairs, three months before the killing, and in the handle of which he put a blade.   This witness stated that he gave the knife to the defendant about an hour or two before he heard that the deceased was killed.

Nelson, the proprietor of the establishment, (who was blind,) stated, that at the beginning of the last altercation in the house, which resulted in the death of McQuillan, when the latter said that he would put the deceased out of the house, he "heard a shuffling of feet, and a rushing to the door, as if in haste, and a sound as if some one had fallen at the door-steps."

It was proved, that the defendant had a knife in his hand when the deceased was down; after the difficulty, whilst walking away, near there, he was seen to throw away something, which was sought for, and proved to be the knife shown and identified in court, as that belonging to the defendant.   The defendant being

asked about the matter, said "he had served him right, that the deceased had kicked him, and ill-used him."

Wilson, a witness, stated that, on the day of the killing, he was on the end of the bridge, near to the grocery; saw two men "drawn off in an attitude of fighting;" they were opposite the door of the grocery; thought he saw the defendant strike at the deceased, and supposed that, from the force of the blow, and a little gully behind the deceased, he stumbled and fell. It was about fifteen feet from the grocery; was some distance off when he first saw them. The deceased was backing and fell; the defendant then sprang upon the deceased, and struck him, as he thought, twice. The deceased cried out, "murder," and witness ran towards them. When the man was down, and defendant striking him, for the first time, he saw something in his hand, which he afterwards discovered to be a knife, (the same exhibited to witness in court, with a blade five or six inches in length.) It seemed to the witness, that the deceased was in a retreating position, at the time defendant struck him.

Kosse, a witness, stated that he was with Wilson, and detailed the same facts as those above given by Wilson.

McQuillan died from the wounds; it was proved that he was somewhat quarrelsome; was about thirty or thirty-five years of age, and weighed about 180 pounds; and that the defendant was feeble, and aged about fifty years.

The jury found the defendant guilty of murder in the second degree, and assessed his punishment at twenty years' imprisonment in the penitentiary. Judgment of the court in accordance with the verdict. There was a motion for a new trial by the defendant, the various grounds of which are involved in the first and second causes assigned, to wit, that the verdict of the jury was contrary to law and the evidence in the case. No exception was taken to the charge given by the court, nor were any instructions asked by the defendant. The motion for a new trial was overruled.

The charge of the court defined murder, and the degrees thereof, and manslaughter; and explained their necessary and

essential elements respectively, as well as the principles of law, which excuse a man acting in the necessary defence of his person, to protect himself from serious bodily harm, or the destruction of his own life.   Under the charge given, the jury were left at liberty either to acquit the prisoner, or find him guilty of murder in the first or second degree, or of manslaughter.

The appellant assigned for error, the overruling of the motion for a new trial; that the punishment assessed by the jury was excessive; that the court erred in the charge to the jury; and that if the defendant was guilty of any offence whatever, it was only manslaughter, from the facts proved.

*Henderson & Johnstone*, for the appellant.

*Attorney-General*, for the appellee.—There is an immaterial discrepancy between the testimony of Quinn, and that of the witnesses Wilson and Kosse, who were standing together some distance off, in reference to what took place out of doors.   These witnesses stated, that when they saw the parties, they were about fifteen feet from the door, in a fighting attitude; that deceased was in a "retreating position," that the accused first struck; and that the witnesses thought the blow, in conjunction with a "little gully" in the rear of deceased, caused him to fall.   Be this as it may, the effect of the testimony is the same.

Wherein does it appear that the verdict of the jury is unsupported by the evidence?   The most that could be said of the conduct of the deceased is, that it was a simple assault and battery, and this will not justify homicide.   (Penal Code, Art. 574.) An attack upon the person of an individual, in order to justify homicide, "must be such as produces a reasonable expectation or fear of death, or some serious bodily injury."   (Penal Code, Art. 572.)   In this case, it is not pretended, that there was any reasonable expectation or fear of death.   The deceased had no weapon or instrument, wherewith death could have been inflicted. There is equally little reason to suppose, that the accused could have reasonably expected or feared " serious bodily harm;" for

although the proof is, that the accused was a much more powerful man, ordinarily, than the deceased, yet it is not controverted that the deceased was very drunk, and, according to the testimony of Quinn, entirely helpless, when the mortal wound was inflicted. In addition to this, the proof shows that the deceased, at no time,. attempted to inflict any serious bodily injury on the accused, or to use more force than was necessary to cause him to leave the house.

It is obvious, that the homicide was not justifiable, and it must, therefore, have been an offence. What, then, is the offence of which the accused is guilty? It cannot be manslaughter, because that is defined to be "voluntary homicide, committed under the *immediate influence* of *sudden* passion, arising from *adequate* cause, but neither justified nor excused by law." (Penal Code, Art. 594.) "By the expression, 'under the immediate influence of sudden passion,' is meant, that the provocation must arise at the time of the commission of the offence, and that the passion is not the result of former provocation." "It is not enough, that the mind is merely agitated by passion arising from some other cause." (Penal Code, Art. 596.)

Here, then, is wanting one of the most essential ingredients of manslaughter ; for the proof shows, that the preparations to commit the homicide, were made under the influence of a former provocation, and that ample time had elapsed for the passion to have subsided. The proof leaves no room to doubt, that the killing was the result of former provocation. Another essential element of manslaughter is, that the passion which prompts the killing, must arise from *adequate* cause, which is defined to mean, " such as would commonly produce a degree of anger, rage, &c., in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." (Penal Code, Art..597.) The offence, then, does not come within the meaning of manslaughter, and the question again recurs, of what offence is the accused guilty ?

" Murder is distinguished from every other species of homicide, by the absence of the circumstances which reduce the offence to negligent homicide, or manslaughter, or which excuse or justify

Killingsworth v. The State.

the homicide." It has been shown, that the homicide in this case is neither excusable or justifiable, nor is it manslaughter. It follows, as a necessary consequence, that it is murder. The jury, in the exercise of a legitimate power, found the accused guilty of murder in the second degree, and it is submitted, that the verdict is abundantly sustained by the law and the facts.

BELL, J.—It would be unprofitable to enter into any elaborate discussion of the facts of this case. They are few and simple, as detailed by the witnesses. The appellant, and the deceased, quarrelled in a drinking house. The deceased was in liquor, and treated the appellant with rudeness and indignity. There are some discrepancies in the statements of the witnesses, but not greater than are generally to be found in the history of all such cases. The testimony shows very satisfactorily, that there was no necessity for the killing at the time it occurred.

The judge charged the jury with great care and accuracy. In the motion for a new trial, there was no pretence that the judge had erred in any part of his charge. Whether the defendant below was guilty or not, and to what extent he was guilty, if guilty at all, were questions for the jury. There is nothing in the record which leads us to doubt that the jury found properly as to his guilt, and exercised a sound judgment in fixing the measure of his punishment.

The judgment of the court below is affirmed.

Judgment affirmed.